J-S72031-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.E.E., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.S. MOTHER AND S.S., STEPFATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1779 EDA 2017 |

Appeal from the Order Entered May 17, 2017
in the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000997-2016

BEFORE:   BENDER, P.J.E., MUSMANNO, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:                **FILED JANUARY 08, 2018**

Appellants, M.S. ("Mother") and S.S. ("Stepfather"), file this appeal from the order dated May 16, 2017, and entered May 17, 2017,[1] in the Philadelphia County Court of Common Pleas, Family Court Division, denying their petition to involuntarily terminate the parental rights of R.E. ("Father") to his minor daughter with Mother, S.E.E. ("the Child"), born in October of 2011, pursuant

_____

*  Former Justice specially assigned to the Superior Court.

[1] The subject order was dated May 16, 2017.  However, the clerk did not provide notice pursuant to Pa.R.C.P. 236(b) until May 17, 2017.  Our appellate rules designate the date of entry of an order as "the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.C.P. 236(b)."  Pa.R.A.P. 108(b).  Further, our Supreme Court has held that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given." ***Frazier v. City of Philadelphia***, 557 Pa. 618, 621, 735 A.2d 113, 115 (1999).

to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1) and (b). After careful review, we reverse the trial court's order, and remand for further proceedings.

The trial court summarized the relevant procedural and factual history as follows:

> The relevant facts and procedural history of this case are as follows: Mother and Father are the biological parents of S.E.[E.] (the "Child"). The Child was born [in October of 2011]. Father was involved in the Child's life during the early period of the Child's life, through visits facilitated by Mother approximately three times a week. During this time, Mother moved approximately two hours away.[2] Mother continued to facilitate visits, driving the Child to and from Father's house. In 2013, Mother initiated a custody action; however, the matter was resolved by an informal arrangement between Mother and Father[] that allowed Father to see the Child every other weekend. . . .Mother testified that the arrangement was not beneficial to the Child because of behaviors the Child exhibited upon return from visits with Father, which included regressed potty-training, rashes, and frequently smelling of smoke.[3]
>
> On October 10, 2014, per a custody order issued by the Philadelphia Family Court, it was ordered that Mother and Father share legal custody of the Child. It was further ordered that Mother was to retain primary physical custody of the Child and

_____

[2] Mother relocated to another section of Philadelphia. Notes of Testimony ("N.T."), 3/28/17, at 11-12; N.T., 3/16/17, at 37; Adoption Personal Interview at 1.

[3] Upon review of the certified record, which includes a copy of the docket of the relevant custody action, it appears that Mother first filed a complaint for custody of the Child in July 2012, which was later dismissed for lack of prosecution in January 2013. Mother then re-filed for custody in August 2013. This comports with the testimony of Mother. N.T., 3/16/17, at 38-42. We observe that, while custody orders dated October 10, 2014, February 24, 2015, August 27, 2015, and August 26, 2016, were not included as part of the certified record as exhibits from the termination hearing, despite admission, N.T., 3/28/17, at 5, these orders were otherwise included as part of the certified record and were reviewed by this Court.

Father was to have partial physical custody of the Child. The order specified that Father's partial physical custody was to be under the supervision of the paternal grandmother and that visits were to occur two days per week for at least three hours each day. Father was also permitted to have partial physical custody of the Child as the parties agreed.

On February 24, 2015, Mother and Father appeared *pro se* at a custody hearing before the Honorable Angeles Roca. At the hearing, Mother was awarded primary physical and legal custody of the Child. Father was granted supervised physical custody of the Child every Sunday from 10:00 am until 3:00 pm at the Family Court nursery. The order indicated that if Father missed two consecutive visits with the Child, Father's supervised physical custody would be suspended. At a hearing held on August 27, 2015, before the Honorable Peter Rogers, Mother testified that Father missed visits for an entire month. Consequently, Father's supervised custody was temporarily suspended, and it was ordered that Father was to have no contact with the Child. Father was not present at the August 27, 2015, hearing.

On October 19, 2015, Mother filed a petition to modify custody. At a custody hearing held on August 26, 2016, before the Honorable Diane Thompson, the [c]ourt granted Mother's petition to modify custody and Mother was granted sole physical and sole legal custody of the Child. The [c]ourt also continued the suspension of Father's supervised partial custody, emphasizing that Father took no affirmative steps to reconnect with the Child in a year. In particular, the [c]ourt reasoned that Father did not petition the [c]ourt to reconsider the August 27, 2015 order suspending Father's supervised visits.

On October 24, 2016, petitioners filed a petition to involuntarily terminate the parental rights of Father.[4] Bifurcated hearings were held before this [c]ourt on March 16, 2017 and May 16, 2017, respectively (collectively the "TPR [termination of parental rights] hearing").[5] At the TPR hearing, Mother testified

---

[4] Mother and Stepfather additionally filed a petition for adoption, which was withdrawn per order dated May 16, 2017, and entered May 17, 2017.

[5] The termination hearing was also conducted on March 28, 2017. In support of their petition to terminate Father's parental rights, Mother and Stepfather

- 3 -

that Father had no visitation with the Child for approximately two years. Furthermore, Mother claimed that Father had no contact with the Child for six months immediately prior to October 24, 2016, the date petitioners filed the petition to terminate Father's parental rights. Mother also indicated that there were two court orders indicating that Father was to have no contact with the Child.[1]

Mother further testified that the Child has a close relationship with the Child's paternal grandmother and paternal cousins. In fact, Mother stated that the Child visits her paternal grandmother regularly. In August 2016, the Child attended a family reunion hosted by [P]aternal [G]randmother, and Father was present at the reunion.[2] Father also sent the Child clothing on several occasions. Mother claims that the Child has never asked to see Father and that the Child calls Father by his first name. Mother also reported that the Child is well adjusted, and that Father has never played a significant role in the Child's life. Mother stated that Father has never filed for any custody of the Child or asked for visitation. When asked about the custody orders suspending Father's custody-visitation, Mother testified that Father was not present at the August 26, 2016 custody hearing, at which time, Father's partial custody was suspended.[3] Father was, however, present at all other custody hearings.[6]

According to the testimony of both petitioners, the Child and Stepfather have a close relationship. Stepfather is the primary financial supporter of the Child and supports the Child's educational efforts, including the Child's speech therapy and

_____

each testified. Additionally, Father was present and testified on his own behalf. Father further presented the testimony of family friend, B.B., and his mother, Paternal Grandmother. The court-appointed child advocate was also present and participated in the proceedings.

We additionally note that, aside from custody orders and photographs marked and admitted as P-1, additional photographs identified as photographs of Father's residence were marked as P-2. N.T., 3/28/17, at 32. Upon review, P-2 was never admitted and was not included as part of the certified record. This omission was not necessary for and does not affect our disposition.

[6] Mother admitted this testimony was incorrect. Father was not present at the custody hearing on August 27, 2015. He was present at all other hearings. N.T., 3/28/17, at 29; N.T., 3/16/16, at 48-51; N.T., 8/26/16, at 5-6.

homeschooling. Petitioners also testified that the Child calls Stepfather "dad." The Child has resided with the petitioners for approximately three and a half years, and the petitioners have another child together. The petitioners recently moved to King of Prussia, Pennsylvania, which is approximately a thirty minute drive to Philadelphia.

At the TPR hearing, [P]aternal [G]randmother testified that she has a very close relationship with the Child and has maintained a relationship with the Child for the entire duration of the Child's life. Paternal [G]randmother indicated that she attends the Child's school functions and brings the Child to family functions with the Child's paternal family. Paternal [G]randmother has also picked the Child up from school when Mother was unable to. Paternal [G]randmother also testified that, up until December 2016[,] when she was hospitalized for various illnesses, she would visit the Child in petitioners' home approximately once a week. On numerous occasions, the petitioners took the Child to the hospital to visit with [P]aternal [G]randmother. Paternal [G]randmother also stated that the Child did in fact attend a family picnic hosted by [P]aternal [G]randmother and that[,] while at the picnic[,] the Child asked for Father, who was not present at the picnic due to stay away orders. When the Child asked for Father, [P]aternal [G]randmother invited Father to the picnic so that he may see the Child. Paternal Grandmother also testified that every year Father purchases clothes for the Child on her birthday. Consistent with Mother's own testimony, [P]aternal [G]randmother testified that, in October of 2016, Father purchased clothes for the Child.

---

[1] Mother is apparently referencing the orders issued on August 27, 2015 by the Honorable Peter Rogers, suspending Father's visitation with the Child, and August 26, 2016, continuing the suspension of Father's visitation.

[2] Mother testified that Father purchased the Child Halloween clothes in October of 2016. Mother also testified that sometime [sic] in 2016, Father purchased the Child a winter jacket.

[3] It is important to note that, per the court certified transcripts of the August 26, 2016 hearing, Father was present and did in fact testify. Father failed to appeal at the August 27, 2015 hearing, at which time his partial custody was temporarily suspended.

Trial Court Opinion ("T.C.O."), 7/10/17, at 1-5 (citations to notes of testimony omitted).

Father testified to early contact with the Child as facilitated by Mother. N.T., 3/28/17, at 11-12. He confirmed the procedural history as to the custody matter, which eventually resulted in an order for supervised visitation at the court nursery. *Id.* at 12-14. Father acknowledged that visitation ceased as he missed two visits. *Id.* at 17, 41, 43. He did not appear at the custody hearing on August 27, 2015, which resulted in an order suspending his visitation. *Id.* at 29. While testifying that he did attempt to file a challenge to the suspension of his visitation, he indicated that he did not do so between the August 27, 2015 hearing and the August 26, 2016 hearing. *Id.* at 27-29; however, Father, had no supporting documentation with him. *Id.* at 29. Father testified that he bought the Child clothes, Christmas gifts and toys, which have not been returned to him. *Id.* at 19, 26. Father further confirmed seeing the Child, who he indicated calls him "Papi," at a family reunion in August 2016. *Id.* at 21-22. He described a positive interaction at the reunion. *Id.* at 23.

By order dated May 16, 2017, and entered May 17, 2017, the trial court denied the petition to terminate Father's parental rights. Thereafter, on June 5, 2017, Mother and Stepfather filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Mother and Stepfather raise the following issues for our review:

1. Did the [c]ourt err by denying the Petition to Terminate Parental Rights of [F]ather pursuant to 23 Pa.C.S.[A.] § 2511(a)(1)?

2. Did the [t]rial [c]ourt err by ruling that it would not be in the child's best interest pursuant to § 2511(b) to terminate the parental rights of [F]ather?

Appellants' Brief at 3.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at [325-26, 47 A.3d at] 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

*In re T.S.M.*, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even

if the record could also support the opposite result." ***In re Adoption of T.B.B.,*** 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re C.S.***, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting ***Matter of Adoption of Charles E.D.M. II***, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998)).

In the case *sub judice*, the trial court declined to terminate Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b), which provide as follows:

**(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> (1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

*  *  *

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

We first examine Section 2511(a)(1).  We have explained this Court's review of a challenge to the sufficiency of the evidence to support the involuntary termination of a parent's rights pursuant to Section 2511(a)(1) as follows:

> To satisfy the requirements of Section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties.  In addition,

>> Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant

- 9 -

to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (internal citations omitted).

As it relates to the crucial six-month period prior to the filing of the petition, this Court has instructed:

[I]t is the six months immediately preceding the filing of the petition that is most critical to our analysis. However, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provisions, but instead consider the individual circumstances of each case.

*In re D.J.S.*, 737 A.2d 283, 286 (Pa.Super. 1999) (citations omitted). This requires the Court to "examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination." *In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (citation omitted).

Further, we have stated:

[t]o be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the

psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

*In re Z.P.*, 994 A.2d 1108, 1119 (Pa.Super. 2010) (citation omitted). *See also In re Adoption of C.L.G.*, 956 A.2d 999, 1006 (Pa.Super 2008) (*en banc*).

Regarding the definition of "parental duties," this Court has stated:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.

*In re B., N.M.*, 856 A.2d at 855 (internal citations omitted).

- 11 -

In the instant matter, in finding a lack of grounds for termination under subsection (a)(1), the trial court concluded:

> Under these specific facts and circumstances, this [c]ourt did not abuse its discretion when it denied [the] petition to terminate the parental rights of Father as to the Child. The record supported a determination that, based upon the totality of the circumstances, termination was not warranted. There was compelling evidence that Father loved the Child and wanted to maintain a relationship with the Child. There was also ample testimony that the Child maintained an ongoing relationship with [P]aternal [G]randmother and had a close relationship with the paternal relatives. According to Mother's own testimony, the Child frequently visited with [P]aternal [G]randmother. At a family reunion hosted by [P]aternal [G]randmother, both the Child and Father were present. Based on the foregoing testimony, the [c]ourt determined that Father would have contact with the Child whether or not his parental rights were terminated because the [P]aternal [G]randmother and relatives would remain active in the Child's life.
>
> Additionally, in making its decision, this [c]ourt gave great weight to the custody orders suspending Father's visitation. But for those orders, this [c]ourt believes that Father would have maintained a relationship with the Child. This [c]ourt found [P]aternal [G]randmother's testimony particularly compelling. For example, consistent with Mother's own testimony, [P]aternal [G]randmother testified that in August of 2016, the Child attended a family picnic with the Child's paternal relatives. Due to the no contact orders, Father did not attend the picnic. It was not until the Child inquired into the whereabouts of Father that [P]aternal [G]randmother invited Father to the picnic.
>
> Based on the foregoing reasons, and in light of the totality of the circumstances, this [c]ourt found that the evidence presented by petitioners did not warrant involuntary termination. In addition, this matter's unique circumstances, particularly the custody orders prohibiting Father from contacting the Child, tilted the balance in favor of denying the [] petition to terminate Father's parental rights.

T.C.O. at 8-9 (citations to the record omitted).

Mother and Stepfather, however, argue that "[t]here is absolutely no compelling evidence from the testimony of [Paternal Grandmother] that Father loved the [C]hild and wanted to maintain a relationship with the Child . . . . Moreover, under the totality of the circumstances[,] there is absolutely clear[] and convincing evidence that Father did not perform parental duties for a period well in excess of the six months." Appellants' Brief at 18. Any financial contribution was limited to an "infrequent gift." *Id.* at 18. Mother and Stepfather further challenge the trial court's finding that the custody orders suspending visitation and prohibiting contact presented an obstacle and assert that this does not "excuse Father's complete and utter abandonment of the Child." *Id.* at 20-21. Moreover, Mother and Stepfather contend that Father did nothing to further his custodial rights. *Id.* at 20. They state:

> Father did nothing to have any custodial rights to the [C]hild. The only thing the father ever did was appear in the adoption court when the [p]etition to [t]erminate his [p]arental [r]ights was scheduled. One could search the record, one could go through all of the transcripts. There is nothing to show an effort by [F]ather to have a day[-]to[-]day relationship with the [C]hild. . . .

*Id.*

Upon our review, we find the record does not support the trial court's determinations as to subsection (a)(1). While Father maintained an early relationship with the Child, this was largely facilitated by Mother, even after she moved further away from Father. N.T., 3/28/17, at 11-12; N.T., 3/16/17, at 35-37. Moreover, and most importantly, the evidence establishes that,

despite providing some birthday and Christmas gifts along with Paternal Grandmother and seeing the Child at a family reunion in August 2016, Father failed to maintain regular contact with and support the Child.[7] Father did not exercise visitation as afforded with the Child,[8] ultimately leading to the suspension of visitation in August 2015. N.T., 3/28/17, at 15-17, 41; N.T. 8/26/16 at 3-4, 13, 17-18. Although the trial court suggests that the custody orders suspending visitation and providing for no contact between Father and the Child essentially created an obstacle to Father's ability to maintain a relationship with the Child, T.C.O. at 9, the court ignores that Father remained idle and made no legal efforts to regain custodial rights for at least one year, if at all. Father simply stopped attending visitation after he missed two visits, assuming he could not go anymore. N.T., 3/28/17, at 17, 41, 43.

Additionally, Father failed to appear for the custody hearing on August 27, 2015, stemming from Mother's petition due to Father's missed visitation and resulting in the temporary suspension of his visitation. N.T., 3/28/17, at 29; N.T., 3/16/16, at 48-51; N.T., 8/26/16, at 5-6; Custody Order, 8/27/15.

---

[7] Despite the testimony of paternal family friend, B.B., that she saw Father with the Child on multiple occasions, Paternal Grandmother, whom the trial court relies on heavily, testified that Father saw the Child "very seldom" over the last three years due to the court proceedings between Mother and Father. N.T., 5/16/17, at 7-8.

[8] Father explained that he initially missed visitation due to side agreements with Mother, on which Mother reneged. N.T., 3/28/17, at 15-17.

- 14 -

Father admittedly did not file for modification or reconsideration thereafter.[9] N.T., 3/28/16, at 28-29, 47. One year later, on August 26, 2016, after a hearing at which Father appeared and was represented by counsel, the suspension was made final. N.T., 8/26/16, at 15-16; Custody Order, 8/26/16. Again, Father sought no reconsideration or further contest. Father testified he made two attempts to file documents pertaining to his visitation, but lacked the requisite funds for filing and received no notification from the trial court that his filings had been rejected.[10] Father failed to present proof to support this contention. N.T., 3/28/17, at 17-19, 27-29. Regardless, Father went at least one year without visitation and without efforts to reinstate visitation with the Child. Moreover, Father did not appreciate this as the reason the trial court made the suspension of visitation a final order. *Id.* at 48. Thus, the evidence clearly demonstrates Father's failure to utilize all available resources to preserve his parental relationship with the Child and a lack of reasonable firmness in resisting obstacles in the path of maintaining this relationship. *See In re B., N.M.*, 856 A.2d at 855.

---

[9] This was a key factor in the trial court's making this order final on August 26, 2016. N.T., 8/26/16, at 16, 19-20. Critically, counsel for Father at the time admitted Father's lack of legal efforts. *Id.* at 18-19.

[10] It is unclear from the record what exactly Father tried to file and when exactly he attempted to do so. However, despite a similar assertion at the August 26, 2016 hearing, N.T., 8/26/16, at 15-16, at the termination hearing on March 28, 2016, in response to cross-examination from counsel for Mother and Stepfather, he clearly stated that he did not attempt to file anything between the two custody hearings. N.T., 3/28/17, at 28-29. Notably, the docket for the custody matter, which was printed in December 2016, does not reflect any filings by Father.

- 15 -

We next review the propriety of termination under Section 2511(b). Our Supreme Court has stated:

> if the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M. [a/k/a E.W.C. & L.M. a/k/a L.C., Jr.]*, [533 Pa. 115, 123, 620 A.2d 481, 485 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 620 Pa. at 628-29, 71 A.3d at 267. The breadth of any bond analysis necessarily depends on the circumstances of a particular case especially where a bond exists to some extent. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted). Additionally, we have stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond may be severed without detrimental effects on the child. *Id.* at 763.

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d at 1121 (internal citations omitted). Moreover,

> [w]hile a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa.Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted). Further,

> [t]he mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.,* 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003).

*In re N.A.M.*, 33 A.3d at 103. *See also In re C.S.,* 761 A.2d at 1202 (court must consider whether natural parental bond exists between child and parent, and whether termination would destroy existing, necessary and beneficial relationship).

In the case *sub judice*, Mother and Stepfather argue the trial court abused its discretion in determining the Child would suffer irreparable emotional harm if Father's parental rights were terminated. Appellants' Brief at 22. They challenge the trial court's finding that their custody orders served

as an obstacle to Father. *Id.* at 22-23. Lastly, they highlight the Child's positive relationship with Stepfather. *Id.* at 23-25.

In concluding that termination of Father's parental rights does not favor the Child's needs and welfare and is not in the Child's best interest pursuant to Section 2511(b), the trial court reasoned as follows:

> In the instant matter, this [c]ourt determined that the Child would suffer irreparable emotional harm if Father's parental rights were terminated. The testimony of both Mother and [P]aternal [G]randmother established that the Child has a bond with the Child's paternal relatives. As to the existence of a parent-child bond between Father and the Child, this [c]ourt considered that Father, based on Mother's own testimony, was involved in the Child's life during the early years of the Child's life. In fact, prior to August 27, 2015, when Father's supervised visits were suspended, Father maintained contact with the Child through visits facilitated by Mother and subsequently supervised at the Court Nursery. This [c]ourt also found that the orders prohibiting Father from visiting the Child has been an obstacle for Father to maintain a close relationship with the Child. Particularly compelling to this [c]ourt was that Father was not present at the custody hearing on August 27, 2015, at which time his partial supervised custody of the Child was suspended. Furthermore, this [c]ourt acknowledged that a bond does exist between the Child and Stepfather and emphasized that allowing the Child to maintain a relationship with Father would not in any way hinder the bond between the Child and Stepfather. In fact, based upon the testimony of all parties, it is clear to this [c]ourt that the Child is loved by all parties and that it would be in the Child's best interest to have two father figures.
>
> For the foregoing reasons, this [c]ourt properly denied [the] petition to terminate the parental rights of Father pursuant to [S]ection 2511(b). Overwhelming evidence was submitted at the TPR hearing to support a finding that petitioners failed to show by clear and convincing evidence that termination was in the best interest of Child.

T.C.O. at 11-12 (citations to the record omitted).

We find the record fails to corroborate the trial court's determination that terminating Father's parental rights was not in the Child's best interests pursuant to Section 2511(b). Testimony of Father's family friend confirmed early contact between Father and the Child. N.T., 3/16/17, at 35-37. In addition, Father and Paternal Grandmother testified to the positive interaction between Father and the Child at the family reunion in August 2016. N.T., 5/16/17, at 9-10; N.T., 3/28/17, at 23. Likewise, Paternal Grandmother opined that Father and the Child miss one another and love one another. N.T., 5/16/17, at 10. However, the record lacks evidence that in light of the minimal recent contact between Father and the Child that termination would have a detrimental impact on the Child. Indeed, as the trial court stated, the existing bond is with the Child's paternal relatives.

While the trial court emphasizes the custody orders suspending visitation and providing for no contact served as an obstacle to Father maintaining a close relationship with the Child, as indicated previously, Father took no legal efforts for at least one year, if at all, to regain visitation. Additionally, both Mother and Stepfather testified that the Child was upset and not herself when picked up from the paternal family reunion. N.T., 3/16/17, at 13-14, 57; N.T., 8/26/16, at 8-9. Mother testified that the Child does not ask for Father, N.T., 3/16/17, at 20, and, as confirmed by Paternal Grandmother, the Child now calls Father by his first name. N.T., 5/16/17, at 10; N.T., 3/16/17, at 16. Further, Mother has facilitated and maintained a relationship between the Child and paternal family, despite the custody

orders, and there is nothing to suggest this would cease. N.T., 3/16/17, at 15.

Moreover, and more importantly, the Child shares a close bond with Stepfather whom she calls "daddy" and with whom she has lived since she was two years old. N.T., 3/16/17, at 8-10, 55. Stepfather supports the Child in all aspects, including educationally, religiously and financially. *Id.* at 10, 55-56.

The record confirms that the termination of Father's parental rights serves the Child's needs and welfare. Accordingly, based upon our review of the record, we conclude that the trial court abused its discretion by failing to terminate Father's parental rights under 23 Pa.C.S.A. § 2511(a)(1) and (b). We, therefore, reverse the order of the trial court, and remand the matter for further proceedings.

Order reversed. Appeal remanded for further proceedings. Jurisdiction relinquished.

P.J.E. Bender joins the memorandum.

Judge Musmanno files a dissenting statement.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/8/18